Good afternoon, your honors. Preliminarily, I have a slight cold. If there's no objection, though, I'd like to remove my mask for argument. That's fine with me. I would ask you if you could speak closer to the microphone, if you can do that, please. Certainly. Is that better? Little bit. Okay, I'll speak up. My voice is a little rough, but I'll do what I can. Do your best, and we understand you're a little bit under the weather. Thank you. Good afternoon, your honors. Marta Van Landingham appearing on behalf of Petitioner Appellant Sean Burney. I'm accompanied today by my co-counsel, Michal Oncic, and I'd like to reserve 10 minutes, and I'll keep track of my time. Before discussing the legal claims before this court, I think it would be helpful to review Burney's circumstances at the time of the crime and the events of the night that Joseph Condrath was tragically killed. These facts are uncontroverted in the record and are all relevant in their own ways to the different claims. Now, with regard to Burney's characteristics, his situation, and his vulnerability, he was 18 years old at the time of the crime. Psychologically and emotionally, though, he had the maturity of a 15-year-old, and I think that fact appears. It's borne out throughout the course of the events. He was not in a gang and basically had a clean record. His mother had, just a couple of weeks before the crime, rather brutally kicked him out of the house in favor of an abusive new husband. So Burney was on the streets. Originally, he turned to friends, but as he was staying with one of his best friends, there was a tragic accident in which a child died. And with the grief in that family, Burney did not feel he could stay there. So he was almost homeless, but he ended up crashing on the floor of a party house, more or less, belonging to two older acquaintances, both of whom were gang members. Now, on the night of the crime, the two gang members, Alan Burnett and Scott Rembert, they were both drunk. They gloved up to steal a car stereo belonging to a neighbor of theirs with whom Burnett was angry for issues involving gang disputes. So they gloved up, they left the house, and Rembert brought his two-shot Derringer pistol. When they couldn't find the car they were looking for and they were frustrated, they were figuring out what to do, how they could get out all their aggression. And that's a little bit not in the record, but it's kind of shown by what happened next. They saw Joseph Condrath, a 23-year-old college student, sitting in his car preparing to go to work, and they decided to jack Condrath and steal his car. They forced Condrath into the trunk. After your client knocked on the window and asked him what time it was?  Yes. From then on, though, Burnett, until the very end, did nothing but drive the car. This was likely because Burnett didn't drive a manual transmission. So Burnett and Rembert directed Burnett to the house of Jeff Howard, one of their co-gang members, who testified at trial that Burnett and Rembert came inside to borrow an untraceable shotgun. In addition to the shotgun, Howard gave Burnett several shotgun shells, and he gave Rembert a handful of bullets for his Derringer. Burnett told him they had someone in the trunk of the car. Then Burnett and Rembert went on the hunt for Watergate Crips, rival gang members who had recently beaten Burnett. Bernie drove them around the Crips neighborhood in Anaheim, or Santa Ana, with Rembert firing his Derringer and Burnett firing the shotgun. At some point during the night, they drove to the home where Burnett's former girlfriend, Cynthia Melson, lived with her mother and a roommate. Burnett and Rembert both shot five or six times at the facade of the house. One bullet missed the roommate's head by inches. After that, they returned to Howard's where Burnett returned the shotgun. And then, as Burnett and Rembert's shooting rampage drew to a close, they decided their neighbor, Condrath, could identify them and had to die. All of them, at this point, had to believe that Burnett and Rembert had killed others that night, whether shooting at Watergate Crips that they saw on the street or shooting at the facade of Cynthia Melson's house. They couldn't have known, because they were shooting through walls, that all the bullets had missed, even though not by much. So they all had to believe that the only one at that point without blood on his hands was Bernie. And so, on that dark street, Bernie opened the trunk partway and, without looking, fired. Well, that's what he said. That is what he said. He also told the officers, and I, meaning him, was like, you gotta kill him, you gotta kill him. So then what happened? I killed him. That was his testimony, that was his statement to the officers, right? He did admit, very remorsefully, very tearfully, to having been the person who affected Condrath's death. But he also told the officers, I was the person who said, you gotta kill him. That's what I'm reading on 978 of the excerpts of the record. There is also quite a bit in the record, though, that shows that Burnett was the one forcing him to kill. I mean, Condrath was Burnett's neighbor, not Bernie's. He was only there temporarily. And I can find for you, happily, the other portions of that statement. I know he said different things. Because he initially, when he was questioned by the officers, he initially denied any involvement at all. Yes. The point here, though, is that regardless of what he said, and he said, like you mentioned, an awful lot of different things. At some times, he was trying to distance himself from the events. Other times, he was taking full accountability. He went back and forth. But the events that I just highlighted are what I think are relevant to show who actually had control of the events that night. Whose agenda was being affected. Who was behind and responsible and motivating of everything. And the only act that Bernie took was firing once. You mean the only act he took was opening the trunk, looking at the guy, taking out his gun, and putting one in the guy's head? The last part there is in dispute. Well, the bullet ended up in his head. It did. It did. And that brings me, though, to the facts regarding how far the trunk was open, how dark it was, whether he was looking or not, those are all in dispute. But as I mentioned, he was a scared kid. He'd never done anything like this before. So that moves me to, though, how in light of these circumstances, Bernie ends up on the side of the worst of the worst. And I think this is where the claims come together. There were a number of constitutional errors in this trial, but the ones we have here on appeal all sort of tied together. The judicial bias claim focuses on the judge's comments that made the fair trial impossible. But the flip side of that, the other way that this judge exhibited his bias, his predetermination of Bernie's guilt and death sentence, also lies in the rulings he made and his decision of a trial that tried all three of these people jointly and involved the introduction and admission into evidence of all of their statements against each other without an opportunity for cross-examination. The court denied over half a dozen motions to sever before the trial actually began. And during the trial, as things kept going very, very wrongly with regard to the statements, there were over a dozen objections and motions for mistrial during the actual trial. I mean, I understand you're arguing that this is part of your showing of the judge was biased, but the only three claims we've got here are the judicial misconduct, the Miranda claim, and the harmlessness or lack thereof of the Bruton claim, right? Those are the only three things we're dealing with today. Bottom line, yes? Yes. I am basically tying the claims together in that judicial bias led to the Bruton error because in the circumstances of this case, it was impossible to not sever the trial, to try them jointly as they did without violation of the Confrontation Clause, without violation of Bruton rule and SAMEA and so on. So on Bruton counsel, you agree that the California Supreme Court said the evidence here was overwhelming. Correct. And they applied the correct legal standard of harmless beyond a reasonable doubt as to the Bruton, they found Bruton error and applied harmless beyond a reasonable doubt. They did, but that finding was unreasonable. Why was it unreasonable, for example, why was the California Supreme Court's determination that the evidence against your client was overwhelming, sometimes they said overwhelming, sometimes they said very strong, why was that something no reasonable jurist could conclude, that the evidence was overwhelming of guilt of your client? Your Honor, there were a number of issues regarding in their harmlessness determination that they failed to take into account and unreasonably did so. There was quite a bit of evidence that only came in against Bernie through the co-defendant's statements. And I want to point out that one of the major impacts of these statements against Bernie was not only at the guilt phase, but it all carried over, it all spilled over into the penalty phase as well. So the jurors heard that Bernie was the one who was responsible for terrorizing Condrath, that he was the one who put a gun to Condrath's head and forced him into the trunk of the car, that he was the one insisting all along that they had to kill Condrath and that he wanted to kill Condrath, not that he was made to by what was happening. So all of that only came in from the co-defendant's statements against Bernie. Well, no, respectfully counsel, the part I just read from his statement, that's some of what he said to the detectives was he can identify us, I said we had to kill him, so I killed him. So, I mean, I'm not arguing with you that there wasn't some other evidence there, but it certainly wasn't the only evidence from the co-defendants because he himself said, I was the one who decided to kill him because he could identify us. Yes, there are two elements there. First of all, that was one statement, while on the other hand, weighing in addition to that you had both the other co-defendants and their counsel and the prosecutor all saying, not only that he did it, but that he drove the events of that night and he made them do it and they argued against him and he kept saying, no, we have to kill him. That is very different from, at the end, I went along with it. And the other part of it, too, is that the whole picture painted would have been very different at penalty especially if not for the story that was piled on by all of the other parties involved here. And also that another part of the issue that the California Supreme Court did not take into account in its harmlessness determination was the defenses that Bernie had lost to him in light of the joint trial. Had he at guilt been able to use his own unredacted statement, he would have shown Burnett's being the prime controlling moving figure in all of this. His coercive role, his instability, his implied threats. Counsel, I thought, and correct me if I'm wrong, I may be remembering this incorrectly, but I thought part of your argument was that part of the redaction substituted for names the word others. Yes. And I thought part of your argument was that with regard to the co-defendant's statements, everybody knew who others was, him. Yes. So wouldn't this reverse be true that with regard to his statement, everybody would know who others was, the other two? Yes, but I think by that point, with all these statements coming in, it became garbled, it became muddy, it became chaotic. You had both the prosecutor and Rembrandt's counsel confusing Burnett and Bernie when they talked about people. Everything was, instead of being allowed to make a clean case as to what happened, it was two other defendants being allowed to say, no, everything was him, it was all him, with his own voice being lost in the cacophony of that trial. And also, without the statements, his duress defense would have been quite a bit clearer. At guilt, he could have argued the coercion factors that I, you know, highlighted at the opening, that they, that duress countered the requirement for deliberated and premeditated mens rea for the first degree murder. And also, that the coercion could have been a defense for the felonies underlying the felony murder theory that the prosecution was preferring. Had Bernie been able to cleanly show that it was Burnett driving all the events and he had really no choice but to go along, he could potentially have gotten a second degree murder conviction.  That's what your, that's what his counsel at trial asked the jury to do, right? Correct. But all of this also spilled over quite dramatically into the penalty phase. At penalty, counsel asked for an instruction saying that there, the co-defendant statements could not come in against Bernie and that was denied. Even though the judge had acknowledged that basically the whole Bruton redactions had been ineffective, he said they've all figured it out. Even under that, he still allowed them to come into statement, into evidence at the penalty phase where the prosecutor read from them heavily in his closings when arguing why Bernie had to die. And... Could you spend some time talking about, you've talked about judicial bias and the denial of the motion to sever. Could you talk about the judicial misconduct claim? I mean, in my mind, there's no argument here that many of the comments that the trial judge made were inappropriate, egregious, etc. But your reliance on Wellens here seems somewhat misplaced because there I think the comments were much worse. And we also don't have supervisory authority over the trial court, so I'm not sure what we are to do, even if we agree that a lot of the remarks were inappropriate. Yes, Your Honor. In Wellens, I think the record is actually not as strong as what we've got here. In Wellens, I think there were implications regarding the inappropriate gifts being given by the jury to the judge. I'm not completely clear on my memory of that case, but here we do have an actual record of all these statements made. Just to remind you if you don't mind. Go ahead, please. I mean, what the Supreme Court said in Wellens is there had been unreported ex-party contacts between the jury and the judge. Jurors in a bailiff had planned a reunion, and either during or immediately following the penalty phase, some jury members gave the trial judge chocolate shaped as genitalia and the bailiff chocolate shaped as other private parts. Right. And so that's why the Supreme Court stated very clearly the precepts that have been underlying pretty much all constitutional jurisprudence here, that everybody has a right to a fair trial before an unbiased jury and an unbiased judge. And they said from beginning to end, judicial proceedings conducted, especially for the purpose of deciding whether a defendant shall be put to death, must be conducted with dignity and respect. And that is the issue here. This trial was very much not conducted with dignity and respect. It was conducted as a open mic night with a goal of having fun and making people laugh and getting through this quickly, saving time and saving money. Because it's clear that the judge had predetermined both the conviction and the penalty and didn't think they needed to waste any more time or be particularly sad about it. So he made misstatements of the law, which under Caldwell, you know, violated Caldwell in that they minimized the jury's sense of responsibility and diluted the gravity of a capital jury's task and therefore presented an intolerable danger of bias toward a death sentence. He, for example, informed them that they didn't have to second, that they couldn't second guess the prosecutor as to why he chose to seek the death penalty on one defendant over the other two. And here I also want to highlight what it must have appeared like to the jury to be presented with three defendants. In theory, you're not going to know who's saying what about whom, but there is Sean Burney who is the only one facing the death penalty. So that right there sets things off on a rather pre-prejudicial basis. And so then to have the jury instructed by the judge who's in a position of preeminence over the whole proceeding to say, you don't have to worry about why he's being charged with the death penalty, take the prosecutor's word for it that he deserves it. Not in those words, but that's the implication. He also told them basically to ignore their own experiences in determining the outcome, which violates Penry and its requirement that the jury impose its, you know, a reasoned moral response based on their own understanding of mercy and such. In terms of minimizing the gravity, he compared execution to getting an ice cream at Baskin Robbins, and he urged them to have an enjoyable experience. And then, of course, finally, there's potentially the most toxic aspect, which is the racism and the overt dog whistles that happen in a courtroom in which you have a jury that has no black people on it, on which the one black prospective juror had to beg the court to let her go because she was so distraught over the racial injustice she was seeing around her. In that situation, you had a judge talking about lynching, talking about how non-white people all look alike, and referring to them as grown boys. All of that, the district court as well found to be worthy of a second look, and I argue here that it's worthy of much more, especially the racial comments, all of which came in during the guilt phase and the penalty phase, and therefore are under de novo review. And I see that I'm at about eight minutes, so unless you have further questions. Thank you. Just for your planning, we'll give you your full ten minutes for rebuttal. Thank you. Good afternoon, and may it please the court. Vincent LaPietra on behalf of Respondent. My friend began with the Bruton issue, so I would like to respond to that. The California Supreme Court clearly, reasonably applied Chapman in determining that admission of these statements did not violate Mr. Burney's right to due process. It correctly determined that the statements were cumulative to Mr. Burney's own statement, and that the statements did not contribute to the verdict in any way. You concede that everybody, in a common sense way, everybody would know who others were? Yes, Your Honor. Okay, go ahead. Yes, Your Honor, and we agree with the court's question about whether that applied also to Mr. Burney's, being able to see through the redaction applied to Mr. Burney's statement, and it did. But what I wanted to note for the court was that there is no federal right to severance, and Mr. Burney is appearing to attempt to bootstrap a severance argument into this Chapman claim. The California Supreme Court. I mean, respectfully, I don't quite see it that way, counsel. I mean, putting aside the AEDPA issue, that they, you're right, they can't claim that the severance was some type of constitutional error, but they certainly can claim that the Bruton problem is a constitutional error because all the people were being tried together, which is the heart of a Bruton claim. So that's built into Bruton itself, right? Yes, however, the application of Chapman is to review the trial that occurred minus the evidentiary error. Right, right. Which is what the California Supreme Court said. You certainly have to look at the delta. And I merely wanted to point out for the court that the California Supreme Court discussed severance and correctly stated that a severance motion is reviewed at the time it was made and ruled on, and at that time, Gray had not applied Bruton to redacted statements, and for that reason, the California Supreme Court said the severance was properly denied under the state court standard. It then applied Gray to the Bruton error and considered Chapman to determine that it was harmless beyond a reasonable doubt. Turning to the court's comments and the due process claim, the court's comments did not render Mr. Bernie's trial fundamentally unfair. The question is one of fundamental fairness and not approval or disapproval of those comments. In this case, there is no evidence that the comments affected presentation of the evidence or the jury's view of that evidence. And so, counsel, you know, I don't disagree with the way the state has laid out the constitutional claims that we have to analyze. But I have to tell you, some of these comments by the trial judge are tremendously concerning. And whether they render the trial fundamentally unfair is a different question. But, I mean, when the trial judge says everybody should believe in it, meaning the death penalty, California has executed one guy so far, and even though we take forever to finalize these things and they do go on, they are to pick up their Baskin-Robbins ticket to step into the gas chamber? I mean, in any case, this is, to me, unacceptable. But in a death penalty case? I mean, presumably, the warden and the attorney general also feel that this has no place in the courtroom. Well, Your Honor, I'm not going to defend the comments as dignified. They certainly were not. But the court said that fundamental fairness was a different question, and respectfully, that is the question that is before the courts today. As this court recognized in Ducat v. Godinez, it does not have supervisory powers over state court judges, and the sole question is fundamental fairness within the meaning of due process and the Constitution. And to that end, there is no evidence that these comments affected the trial, either the presentation of evidence or the reception of that evidence by the jury. The trial was five months long, and the reporter's transcript is over 2,000 pages. The bulk of these comments came from voir dire and can be seen as an effort to put the jury at ease in an unfamiliar situation. Bernie has failed to establish that these comments substantially affected the trial. The court emphasized the seriousness of the jury's task, and it told the jury to disregard his offhand remarks. The presentation of evidence and argument was professional, and there is simply no evidence to establish the denial of a fair trial or due process. California Supreme Court reasonably denied this claim as meritless. The district court properly denied the claim, and I would ask this court to affirm his judgment. The last thing I neglect to say regarding the Bernie error is my friend mentioned that the Bruton error bled into the penalty phase. However, I would read from the California Supreme Court's opinion regarding this, because I'm a little confused, because the California Supreme Court said that the prosecutor did not refer at the penalty phase of the trial to the redacted statements of the co-defendants, which were not admitted into evidence against Bernie, and the jury was instructed not to consider those statements as evidence against Bernie at the penalty phase. That's excerpts of records 214, 215. So, there was certainly no Bruton error in the penalty phase. Pending any questions. Thank you. Take your time to get organized. First of all, if I may, I would like to take us to your Honor's concern with what Bernie himself said during his interrogation, and I think there's a transcription error or confusion here about exactly what Bernie said. When you were saying that, I was thinking, I don't remember Bernie saying I was the one who wanted to kill him, and I think if you look at this, he didn't. What page are you on? We are on 4 ER 978 at the top of the page. Why don't you go ahead. My numbering is a little bit different, but go ahead. And I think what you may have been referring to is where Bernie said, I wasn't looking at him, I just know he didn't say nothing. I opened the trunk, I wasn't looking at him, and I was like, no, man, can't do this. And I was like, you got to kill him, you got to kill him. So I think that might be what you were referring to, your Honor, when you were saying he's the one who was saying I have to do it, and so then what happened, I killed him. But in light. Well, I can tell you what I am looking at here is what on my pages at the top right is 978 out of 1361, and then in the bottom right, 2823. I wasn't looking at him, I just know he didn't say nothing, I opened the trunk, I wasn't looking at him, and I was like, no, man, can't do this. And I was like, you got to kill him, you got to kill him. Officer, so then what happened? I killed him. Correct, that's what I was just looking at as well. And that's why I think it's a confused, I think this is pretty clearly a confused young man saying, I was like, no, man, I can't do this, and I was like, you got to kill him, you got to kill him. But I was reading it correctly in the transcript, yes? Yes, correct. All right, go ahead. But I think that's an error, especially if you keep writing down what happened, I killed him, and then at the bottom of that same page, Bernie, and I was like, no, man, I was like, no, no, you know, you know, do it, you know, just leave him there, he won't. So it's very confused who he's speaking to, who's saying what, who's saying what, you know. He won't, you know, he won't say nothing, he won't say nothing, but one of the others kept saying, no, you got to kill him, you got to kill him. So there he's making it clear that it was one of the others saying, no, you got to kill him, and that's the words he used up above. Well, he also said earlier in the transcript that he didn't even know that the person was in the trunk. That was, yes, he went through the story six different times. He was taken by the police six different times through the whole version, and it changed substantially either, every time, which is why I started out by talking about his vulnerability, his emotional youth, he was not a sophisticated person here at all. And eventually the police kept telling him, no, but this is what happened, that this is what happened, we know it's what happened, and he would echo them. And eventually he did get to where he was broken down, sobbing, saying, I'm so sorry, I wish I could take it all back, and that's where he talked about he was the one who fired the shot. But I do read differently. I don't think he ever said, I was telling the others we have to kill him. I think he was saying, they were saying, you got to do it, you got to do it. But again, this is open to interpretation, but I just wanted to clarify how I read it. And then with regard to the overall fundamental fairness of this trial, I mean, the claims really do come together, and that you had a situation in which there could have been decisions made by the judge that would not have resulted in such fundamental error. Everything was racialized at that point in time. Everybody was more aware of race than at many other times, well, in recent history at least. With the recent Rodney King violence that had been everywhere and had been incredibly racialized, with the carjacking hysteria, which was brought into the courtroom by this being one of the first convictions on carjacking basis, with an all-white jury, or at least a jury with no black people and no Asians, and with all black defendants, and with a judge who kept referring to race, there was no way that Sean Burney could get, and he didn't get, a fair trial here. He was a kid, barely 18 years old, low IQ, emotionally very young, who found himself in circumstances where he was dependent on others, where he was terrified of being thrown out, of being shot because he didn't have blood on his hands and could turn on the others. He did something horrible in the heat of the moment, but he is not the worst of the worst by far. He is not whom the Constitution imagines when it considers the death penalty, and I ask your honors to take that into account when reviewing the claims here. All right, we thank counsel for their arguments. The case just argued is submitted, and with that, we are adjourned. Thank you. All rise. Court is in session. Stand adjourned.
judges: BENNETT, VANDYKE, THOMAS